162583 Merck Sharp v. Warner Chilcott The case involves an obviousness finding based on a single prior reference, the 015 patent, which is directed to a ring intentionally designed to deliver the required hormones from two medicated compartments. The District Court modified that reference using a 100-year-old law, fixed law, to eliminate one of the compartments and change it into a ring with one compartment delivering all of the required hormones. But the 015 patent, prior patent itself, recounts the history of failed efforts to make one-compartment rings where one compartment delivered the physiologically required amounts. Poses had recognized the advantages of a one-compartment ring 25 years earlier due to mechanical issues, for example, it's easier to assemble. And they tried to make one-compartment rings, rings where one compartment delivered all of the hormones, using fixed law. But every attempt, going back 25 years, failed to provide the required physiological required amounts. That is, a contraceptive ring needs to deliver estrogen and progestin on a daily basis at about the same rate over a period of time, typically 21 days. Can I ask you, this is kind of very specific, but on page 19 of the District Court's opinion, he talks about what he says is a specific example in the 015 patent of still a two-ring solution, but a two-ring solution where, if I'm reading it correctly, the combined part compartment could be up to 97% of the ring. If you have 97% of the ring as a combined compartment, which is what your ring is, 100%, is it really that big of a stretch to go from 97% combined to 100%? Your Honor, the 015 patent discloses a generic teaching of saying that the second compartment can be anywhere from a 1 to 30 ratio to the first compartment to 31. It just discloses release rates on preferred embodiments only. That disclosure says nothing about what would happen to release rates if you modified the compartment to go from what, in every example, the second compartment is about 10% of the overall ring. And that's a disclosure, I think, in page 3 of the 015 patent, and it simply states that you can make modifications, but when it gets to release rates, it talks about that as being release rates obtained at specific preferred embodiments. So it never says that you're going to get good release rates if you try and shift everything over to 97% of the ring. I don't understand what you're saying. I mean, if there's an example that shows a 97% release rate, as Judge Hughes says, why isn't it obvious to go to 100% because of the advantages of having a single ring rather than two? Your Honor, I'm looking at it two ways. There's not a specific example. There's a teaching on page A3041, which states, The lengths of the compartments of the ring-shaped device are chosen to give the required performance. Ratios of the lengths of the first and second compartment are contemplated to be between 30 to 1 and 1 to 30, but usually between 15 to 1 and 1 to 1. That is mostly the first compartment, which has all the progestin, only progestin, and preferably about 2 to 1. There's no teaching there about what would happen with respect to the release rate. So what I'm talking about is not a motivation to try things. The question we're talking about is whether there would be a reasonable expectation of success in delivering the physiologically required amounts. So there's no specific example. It just says you can make modifications. But the preferred release rates are talked about later in the patent with respect to preferred embodiments. So if we focus on a reasonable expectation of success, that is, did a POSA have a reasonable expectation of success that if you shifted all of the progestin into one compartment, would that give you the steady release rates that are required? That page 3, A3841, does not address that. There's no specific example. There's no discussion of release rates at all. In fact, the 015 patent is embracing the teachings of the 576 patent. It states on page 1 that all prior attempts to put everything into one compartment, all the P and all the E, have failed. And it cites the 576 patent, which gives a history of the prior art as well, and then gives what I think is very crucial here, two examples. The 576 patent at page A3065 has an example 6. Example 6 has a first compartment, which is about 90% of the ring, which is only progestin. Then it has a second compartment, which is 10% of the ring, having some more progestin, so it's a smaller amount, and all the estrogen. And at that page it teaches, for example 6, that you get a linear release rate. But the 576 patent also has an example 1, where it shifts all of the progestin into one compartment. And it teaches at page A3061 that you get release rates like figure 5, which shows that the progestin is steady but the estrogen drops down dramatically. So the idea of going from having some of the progestin in a second compartment to all of it, the only teaching in the art at all is the 576 patent, which shows the release rate goes down, and then the prior attempts that are referred to in the 015 patent. But the prior attempts failed because of mechanical problems having to do with blast stoppers and things like that, right? No, Your Honor. Example 1, for example, is one where they put stoppers in to see what would happen to the release rate. They kept the compartments separate. There was no question about it. Example 1 of the 576 teaches if I put those stoppers in, I put all of the progestin and estrogen into one compartment, the release rate I get has a steady decline of estrogen over a daily basis. So the issue is not simply the stoppers. And if we go to the 015 patent itself, and that's at page A3039, the 015 patent does not teach that the problem is the stoppers. It goes through the history of these attempts at one compartment, and at line 21 says, These above-mentioned one-compartment rings have the disadvantage that when loaded with more than one active substance, release patterns of these substances cannot be adjusted independently. Such devices usually show suboptimum release patterns for the different substances, whereas it is generally preferred that all substances are released in a controlled rate and during a similar duration of time. As a consequence, the release ratio of the active substances undergoes a change after a period of time. So it's not talking about stopper problems. It's saying that if I try and load all of the progestin and estrogen into one compartment, That's before the 015, right? That's the 015, that's right. No, but the prior art references that talked about the release rate problems were before the 015. Right, so the 015 is the prior reference that's relied on by the court, and it is then teaching somebody skilled in the art reading the 015, which is the issue here. What would the person learn about attempts to put all of the progestin and estrogen into one compartment? And the answer is, you don't get the right release rates. And then if you look at the 015. Where does the 015 say you don't get the right release rates? That's in page 3039. If we go to line 23, so from lines 10 to 20, there we're counting these one compartment attempts. One example is the 965 patent. You see that in line 18, Your Honor? And the 965 patent is one where they use fixed law, and they put all of the progestin and estrogen in one compartment. So there's a discussion of a three-layered, one-compartment ring. There's no issue about stoppers there. And then it goes on, if you look, Your Honor, at line 23, it says, Such devices usually show sub-optimum release patterns for the different substances. And then it goes on and says, It's generally preferred all the substances are released in a controlled rate and during a similar duration of time. Meaning you want the estrogen and progestin to come out at the same rate, the same dosage every day over the period of use. And it says, As a consequence, the release ratio, that's the release ratio of what you release of progestin and estrogen, undergoes a change after a period of time. It means that you start off with estrogen and progestin at the right ratios, but one of them starts declining as to what it's supposed to be delivering, and then you get that effect that's shown in the 576 patent, where when you load it all in one compartment, one of the two substances cannot be released at the proper ratio relative to the other. Because for a contraceptive device, you need, for example, a certain amount of progestin and a certain amount of estrogen every day, same amount, same ratio. Am I correct that the discovery that if you supersaturate the progestin, that sort of is essential and a key to why a single compartment ring works? It was essential, yes, Your Honor. And the finding of a... Tell me why the 015 patent doesn't provide a sufficient teaching of supersaturation. Well, the 015 patent does not provide any teaching of supersaturation, nothing explicit. There are several compartments, second compartments in the 015 patent, that have various concentrations of progestin. One of those... Dr. Kaiser testified that at those concentrations, one of ordinary skill in the art would understand that it's supersaturated. No, Your Honor, he actually conceded that at 0.8, which is the concentration we're talking about, it could be supersaturated or it could simply be saturated with crystals. So 0.8 wouldn't tell you one way or another. There was no dispute on that at trial. The question, then, is since you have a concentration of 0.8, you either can be supersaturated or you can be saturated with crystals in it. There was no teaching in the 015 patent as to whether it was, in fact, saturated with crystals or supersaturated, and the court's finding was based on the idea of silence. There was a reference to the first compartment. Silence in the sense that it doesn't teach away. With adherence, Your Honor, I think the silence went to the court said that there's a strong inference that, in fact, it was supersaturated. So the question here was not the teaching away question. It was whether or not if you have silence as to whether or not there's crystals present, are you then to assume that there are no crystals present? Because you had a first compartment which said, the description was, there are crystals present in the first compartment  With respect to the second compartment, which is the one at issue here, which had 0.8, there was no teaching one way or another whether or not crystals were present. So the court presumes. Well, that's just one particular one, right? And based on Dr. Kaiser's testimony, it could be either way. It could be supersaturated or it could not with crystals. That's right, Your Honor. So that means that it doesn't meet. Teaching both ways. Right, which means it doesn't meet the standards of the court here for inherent anticipation that supersaturation is required for the claims. And by this court's standards, the missing feature, which is supersaturation, needs to be necessarily present, not merely present, possibly or probably present. It has to be necessarily present. And all Dr. Kaiser could say was that there may or may not be crystals in there. There's silence on it. And if he concludes based on silence, that tells you something. It doesn't eliminate the possibility. Did he testify that someone skilled in the art would know to try supersaturation as a mechanism for getting this into a single compartment? No, Your Honor, he did not. He testified that there was an inherency in the 0.8 compartment. He did not say that someone would know to try to do that. In fact, there was no teaching anywhere in the art of using supersaturation as a design parameter anywhere, and he never testified to that effect. So supersaturation, there's no teaching in the art. There's no teaching in the 0.15 patent. It simply came down to an inherency issue for obviousness. There was no recognition anywhere that anyone pointed to that someone knew anything was supersaturated here. It was one of several compartments they pointed to and said, well, we think that's supersaturated. Your Honor, I'd like to just make one other point before I run out through my rebuttal time right now, but on nexus, the court's handling of the secondary considerations went squarely against this court's requirements. The court did not find a presumption of nexus, even though Nuvaring is, in fact, an embodiment of the claims. In fact, Nuvaring is example five of the 581 patent. It's completely coextensive with it, and the court should have found that there was a presumption of nexus. That was a legal error. The second legal error is that the court required us, then, to prove that the nexus was tied to an inventive feature of the claim, but this court's precedent says you look at the invention as a whole. So there are two legal errors with respect to nexus. There's evidence of long-felt need going back 25 years, failure of others. There has never been a successful contraceptive ring with progestin and estrogen on the market until Nuvaring. Thank you, Your Honor. Okay, I'll give you two minutes for rebuttal. Mr. Lombardi? May it please the Court, Your Honor, may I start with where counsel started, which is what the 015 teaches. The 015 teaches that you can get a single compartment that comprises 97% of a contraceptive ring that has more progestin than estrogen, that has supersaturated amounts of progestin, and that delivers in the proper manner, that, in other words, has a good release. That's what the 015 teaches. Where does the 015 teach the appropriate release rates when the ring with the mixture is 97%? The 015 doesn't have a teaching that specifically says at 97% this is the rates. I thought that's what you said just a minute ago.  The 97% shows that you have a ring that can have both progestin. This is what it's taught. The ring can be 97% of the ring, the compartment, that has both progestin and estrogen in it, and that has a greater amount of progestin and estrogen based on the ranges taught in the 015. And it teaches that the rings of this invention, of the 015 invention, are, in fact, good releases, have good releases. So where does it teach that? I guess that's the question. It teaches generally, Your Honor, and I think it's on the second page of the 015. It's at Appendix 3040 that it's an objective of the present invention to provide a safe ring-shaped device with a good release pattern. But the problem is you have to go to one place to get the 97%. You have to go to a different place to get the concentration. And then you're relying on this general statement of reaching good release rates, and you're pulling them all together without any suggestion in the 015 that there's a reasonable expectation of success when you can combine this one very different from the embodiment's proportions and very different from the embodiment's concentrations. So, yes, you may be able to point to specific places, but given that it's so different than the actual embodiments, how is there any support for a reasonable expectation of success? Well, there's support because it's in a printed publication, Your Honor, that is out there. And the question is what does it teach a person of skill? These pharmaceutical cases seem to me sometimes to be a little different because you may have a broad range of combinations and things like that, and it may cover a lot of things, but they may not specifically identify certain different combinations. And without identifying the specific combination, how do we know that that actually works? Well, you know that it works because it's taught in the patent application that it works, Your Honor. That's the answer. Patent applications are printed publications which are presumed enabled. This specific patent application also teaches us that one-ring solutions don't work. Well, certain one-ring solutions don't work. And the district court dealt with that factual issue of teaching away very specifically and very carefully. And the district court pointed out that the prior art one-ring solutions that counsel has referred to and that are referred to in the 015 are different. They either use a different polymer or don't use a polymer, they use silicone, or they use a different structure or both. And so it was a different situation with those specific prior art single compartment approaches. What happened in the 015 was it used a different structure and a different material, not silicone, and it was that that led the 015 to be able to put everything in one compartment. And so the 015 teaching on its face is that this 97% compartment can have both in it, both progestin and estrogen in it, and can have supersaturated progestin in it, and can get good release rates. Did your expert address this? Yes. Our expert absolutely. I mean, that's all interesting what the lawyer argument is on this. If we have a factual finding by the district court, the question is whether it's clearly erroneous or not. What evidence was there from the expert in addition to the language of the reference that you're relying on that leads to this conclusion? The expert essentially testified that the understanding of one of skill and the art would be when you have a 90- Where did he say this? Where? I will get a page set for you on it. But this was all fully testified to by Dr. Kaiser. You're supposed to come with the references. You're supposed to be more familiar with the record than we are so that you can help us. And I will help you, Your Honor. I will have the exact page reference in just a moment, Your Honor. But the teaching waypoint, members of the panel, is that it was a different form of single compartment that was rejected in the prior art. And the 015 took us to a different method of doing that and a different type of structure and different materials being used. And that's why the 015 was the advance that it was, and that's why the 015 would be expected to work where those did not or not. I want to come back to my question about where in the 015 reference there is something to suggest that when you expand the mixed compartment to 97% of the ring that you would get a physiologically satisfactory release rate of both components. I will concede, Your Honor, that there is not an example that deals with 97%. I'm not asking for an example. I'm asking for anything, any kind of a teaching whatsoever. The teaching of the 015 is one invention, Your Honor. It is an invention that has various ranges of progestin and estrogen suggested, various substances suggested that you can make the rings with. Yeah, but I don't find any suggestion in that reference. I don't find anything at all that indicates that if you go to this particular end of the range that the result would be satisfactory. Well, the suggestion is on the face of it, it's right on the face of the 015, that within the ranges suggested in the 015, within the ranges suggested in the 015, you get good release patterns. What did your expert say about this? That's the question. This is what Judge Spleet relied on. Show us what your expert said about it. I'll refer, Your Honor, to Appendix 2263 and Appendix 2278-79. Wait a minute. Don't give us the range. Just show us the specific testimony that deals with this so we can look at it. That's the testimony. Where? What page? Appendix 2263, for instance, Your Honor. Where? Okay, where? At line 10. This is where Dr. Kaiser is talking about the disclosure that you can make with more progestin than estrogen. It then goes down at line 22. It includes ratios where you would put more progestin than estrogen into this mixed component we've been talking about. And where does it say, if you do that, you get physiologically appropriate release rates? Well, the physiologically appropriate release rates are a matter of fixed law. Does he address the question? Yes, he does. Where? He does. He addresses it. I don't think there's any dispute here that he addresses fixed law. No, but where does he say you would get? Where does he address the 97% in the release rates? Appendix at 2278, Your Honor, going over to 2279, line 19. Does 015 disclose the links of the second compartment that can be changed? Yes, it does. Did you bring a demonstrative to illustrate that? And he identifies the demonstrative. At line 4 on the next page, 2279, so the inventor here is saying that you can choose to give the required performance of the IVR, which is basically delivering the physiologically required amount of the IVR, you can vary the relative lengths of these two compartments from 30 to 1 to 1 to 30. So this is very fungible. This works out to be 97% of the total length. It could be for the first compartment and 3% for the mixed compartment. Or you can invert it like I did there on the right. So whatever the concentrations of progestin and estrogen, can that mixed compartment be effectively the entirety of the device? Repeat the question. And then he ultimately says at line 20, yes, it does. So the district court's conclusions on these matters were fully supported by what Dr. Kaiser testified to. And Dr. Kaiser – I'm not sure this is that clear and convincing. The answer that Dr. Kaiser gave, line 4 on page 2279, he says, yes, so the inventor here is saying that you choose to give the required performance of the IVR, which is basically delivering the psychologically required, physiologically required amount of IVR. You can vary the lengths. It seems to me that that's simply a conclusion that he's drawing without pointing to any specific teaching in the reference, which, again, I find missing. Well, what he says, so the inventor here, Your Honor, at line 4, that's referring back to the 015 reference. And the 015 reference has a specific language about 1 to 30 and 31, which I can point out to you, Your Honor. Yeah, but, again, I don't want to beat a dead horse to death here, but the reference talks about physiologically appropriate release rates with respect to some specific examples, not necessarily the entire range of mixtures. So it seems to me he's drawing some sort of a conclusion without real basis to do so. Well, and, Your Honor, I think this testimony indicates that he actually was looking at the 015 and speaking as a person of ordinary skill would have understood that portion of the 015 and would have understood it to indicate that you can use it in the suggested way. Okay. Let me just pick up on that a little bit. Tell me about the supersaturation because it seems to me that's the key to the success of the single compartment mixed ring, that the progestin is supersaturated. And I just don't find a teaching, again, to suggest any sort of link between supersaturation and the success of a single component. Well, there are two aspects of the supersaturation, Your Honor. First is, and I think counsel alluded to this, there is the amount of progestin has to be over a certain level in order for supersaturation to be possible. There's no dispute that there are teachings and examples that use an amount that would be supersaturated. That might be supersaturated. Correct. But might not be. That's right. So that's not enough to support an inference of supersaturation. But here's where, and again, this is a factual finding that the district court carefully considered. Here was the evidence on that, Your Honor, that when the crystallization, which is the opposite of dissolution obviously, when crystallization occurs, that's important to the person's skill in the art, and that is specifically pointed out in the 015, instances where crystallization occurs. Where it did not occur, it was not pointed out. And so the district court concluded that because the 015 was well aware, well aware of crystallization, and well aware of calling it out when it does occur, that when it didn't mention crystallization, it was fair to conclude that there was complete dissolution. That was the finding of the district court, which, again, is carefully laid out in the opinion. And that is sufficient to satisfy the requirements of inherency. You don't have to have an express statement. That necessarily shows that there's supersaturation when you don't have crystallization? Maybe there's no crystallization because there just isn't, there's less than a saturated amount. Well, but that's not what it teaches. The patent teaches examples where there is a saturated amount, 0.8, and that's in examples 2 and 3. It's a range. It's a range, and so it could be the lower end of the range. Well, now, Your Honor, I'm talking about the example where there's a specific example of the use of an amount that potentially could be supersaturated, 0.8. And that's in examples 2 and 3, compartment 2, Your Honor, of the 015. And when that example is discussed, there's no discussion of crystallization. And the court concluded that had there been crystallization, this reference indicated it talks about it. And there was no reference to crystallization. So the conclusion was that there was dissolution and that supersaturation did, in fact, occur. Now, you can prove inherency through inference. Just like you can prove beyond a reasonable doubt, you can prove something beyond a reasonable doubt through circumstantial evidence. The fact that it's inference doesn't make it less of a conclusion. And the court specifically noted that it had come to the conclusion, and this is at page 15 to 17 of the opinion, that the 581 patent discloses that the ETO is fully dissolved, the progestin is fully dissolved. So that's a factual finding made by the court based on the record. You're out of time, but I just want to ask you and try to keep it brief on the secondary considerations. Yes, Your Honor. I am not myself so worried about the accidental use of primifacia and rebutting, but here it seems an awful lot like the district court made a conclusion of obviousness, finished that section and said it's obvious, and then moved on to the secondary considerations. Isn't that error under our precedent? And also, just briefly address the nexus question because I'm a little troubled by that, too. Yes, Your Honor, and I will try to be brief. I think it's clear from the context of the entire opinion that the district court understood the proper analysis for secondary considerations. It considered the Graham factors and motivation combined first, and then it turned to secondary considerations. It recognized that the burden of proof never shifts expressly. It recognized that, and I can point that out, Your Honor, if that would be helpful, but it recognized that the burden of proof never changes expressly and recognized that it stayed with Warner Chilcott throughout. And so I don't believe that there was an issue here of the court flipping the burden of proof onto the other side in this instance, and there's nothing to indicate that that's the case. But, I mean, again, I don't want to belabor this. On page 24, the courts find that Merck's secondary considerations fail to rebut the determination of obviousness. I mean, isn't that putting the burden on the wrong party? Well, Your Honor, it says earlier in the opinion specifically that the burden is on Warner Chilcott and stays on Warner Chilcott. It says at page 23, the beginning of the secondary consideration section, Your Honor, Merck contends that even if Warner Chilcott succeeded in presenting a prima facie case of obviousness, that secondary considerations of non-obviousness rebut this showing. And so that indicates to me, and I think fairly, that the court understood that what Warner Chilcott had done was establish a prima facie case, an initial showing that then he has now to consider the secondary considerations and that the burden. But he keeps saying that Merck has to rebut them, but you agree that that's not Merck's obligation to rebut them. No, I agree that the burden is on us to establish overall, given all the evidence, that there's obviousness. I agree with that, Your Honor. Senator, this whole question of whether he used the right language or didn't use the right language is kind of irrelevant if he misunderstood that there was significant secondary consideration evidence. Could you address that question? Because it seems as though his commercial success analysis is questionable. Well, Your Honor, I think he carefully considered the secondary consideration evidence that was provided, and the factual findings concerning secondary considerations are not challenged on this appeal. And the bottom line, I think... Wait, wait, wait. I'm not sure that's true. I think they certainly do argue that his dismissal of commercial success was erroneous. They argue that it's erroneous on the basis of the nexus issue. They don't argue that he was wrong in what he found about commercial success per se. Well, the underlying factual findings. But do those factual findings show that there was a lack of commercial success? I'm dubious about that. Well, they don't show that there was commercial success for purposes of obviousness, Your Honor. But the ring that was sold was an embodiment of the patented invention, right? The ring that was sold was an embodiment. That's correct. That creates a presumption of nexus. It does, which can be rebutted. And the court found, the bottom line, I think, summarizing what the court found about each of the secondary consideration pieces of evidence, was that there was nothing in that evidence that taught or showed that the 581 invention was something new or novel beyond what existed in the art namely the 015. And that is what this court is concerned with, with secondary considerations, is do the secondary considerations provide evidence that there's something new about the 581 patent over the nearest prior art, which in this case was the 015. And the court very clearly found that that kind of showing had not been made in this case. And on commercial success, Your Honor, the court found, and this is what I mean by what was not challenged in this appeal, found factual findings that the expert on Merck's side was not reliable, that he omitted to consider marketing in the course of doing the analysis. But, I mean, the analysis somehow that it wasn't commercially successful immediately, what does that have to do with it? Well, it has something to do with it given the way that it was presented in court. The commercial success expert, it wasn't just immediately, Your Honor, it was a period of seven years that they didn't consider the results. And the results didn't indicate that there was a profit for this drug. And so they attempted to provide commercial success testimony. Their expert was not credible. We presented a contrary expert. And so the district court concluded that commercial success didn't support the idea that the 581. Well, is commercial success measured in terms of profit or in terms of revenue? I think probably both, Your Honor. It depends on the particular situation. In other words, I'm not saying that there weren't revenues associated with the ring. But the ultimate question is, does whatever commercial success exists that happened here show that the 581 was novel as compared to the 015 and any other prior art? Okay. Thanks. I think we're out of time unless there are further questions. Thank you. Thank you, Mr. Lombardi. Mr. Nimrod, you have two minutes here for rebuttal. Your Honor, just briefly on the Nexus issue. Can you address this testimony on 2279 first? 2279? Yeah, about the 97% and all of that. I mean, I'm not so sure that this says what your colleague says it says, but I'm not sure that it doesn't. Your Honor, this testimony is simply stating that you can deliver the physiologically required amounts in some way. But then it just goes on and says you can vary the lengths. It doesn't get to, and there's no teaching in the patent. So I'd say two things. Either it doesn't address it, which I don't think it does. It simply states there's a teaching about delivering the amounts and then says you can make adjustments.  And if you go to the reference itself, there's no teaching at all as to what would happen when you went to something with 97%. So let me make sure I've got this. What you think this says is it says you can vary the amounts and it can be effectively almost the entire ring. But it doesn't say anything about whether it'll work. That's right, Your Honor. It doesn't say what will happen, and there's no teaching in the patent about it. And it's completely conclusory. Your Honor, on the Nexus issue, just very briefly, the counsel has stated he agrees that there should have been a presumption. If you go to page A26, Longfelt Need, 25 years of failures, the court concludes, Merck fails to show a nexus between industry recognition of Longfelt Need and the patented features. At the bottom of that paragraph, the court states, because there is no relationship between the inventive features and the industry recognition, they do not weigh in favor of a finding of non-obviousness. The court imposed the burden on Merck. It was not an issue of whether or not he found a nexus and found it overcome, excuse me, presumed nexus and it was overcome in some way. The burden was put on us, and it was an improper burden because he said you need to find an inventive feature after he'd already concluded that he said there was no invention. And then on the issue of inherency, Your Honor, the only teaching of crystallinity, excuse me, is on page, in the abstract and then on page 3041 of the record, this is in the 015, it says typically the first compartment comprises progestin in crystalline form. That's it. There's no reference every time there's crystals because they're being very careful about it. There's one teaching that says typically the first compartment has crystals in it. It says nothing about anything going on with the second compartment which can be subsaturated, and therefore there would be no reference to it. And even if there was an inherency with respect to supersaturation, which there is not, that doesn't get you to a reasonable expectation of success. The court made one finding with respect to supersaturation and stability. He said at page A16, second, although the PCT 015 does not teach that a supersaturated ring would be stable, it also does not indicate that a supersaturated ring would be unstable. That is not an affirmative finding of anything that there would be an expectation of success. It doesn't tell you if you load all the progestin and estrogen in one compartment that you'll get the required physiological delivered amounts over the 21 days that are required there. We're well over here. Thank you. Thank you. Thank both counsels.